**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00667-FYP** |
| **v.** | : | |
| | : | |
| **CARA HENTSCHEL,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Cara Hentschel to three months of incarceration followed by a three-year term of probation, sixty hours of community service, and $500 restitution.

## I.     Introduction

Defendant Cara Hentschel and her co-defendant, Mahailya Pryer, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on May 18, 2022 (ECF No. 32 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Hentschel pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a split sentence of three months of incarceration followed by a three-year term of probation, 60 hours of community service, and a $500 restitution is appropriate in this case because Hentschel (1) unlawfully entered the Capitol at the Rotunda Doors, the site of one of the most consequential breaches of the Capitol on January 6, 2021, minutes after a violent breach where police officers were assaulted and the doors' glass panels were smashed; (2) encouraged and celebrated the riot through her social media account minutes before entering the Capitol; (3) bragged and boasted about her involvement and justified the riot through her social media accounts in the hours and days after the riot; (4) admittedly deleted incriminating information from her mobile telephone before she was arrested in this case; (5) has an extensive criminal history;  (6) was on probation for felony offenses when she traveled to Washington D.C. and participated in the riot; and (7) has not to date expressed remorse for her involvement in the riot.

The Court must also consider that Hentschel's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). Hentschel's actions and those of her fellow rioters enabled the breach on the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States*

*v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). And while Hentschel did not directly participate in violence during the riot, she cannot be absolved of culpability because "[l]aw-enforcement officers were overwhelmed by the sheer swath of criminality. And those who engaged in violence that day were able to do so because they found safety in numbers." *See United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, p. 2.  From the most mundane actions to the most violent, each rioter contributed directly and indirectly to the violence and destruction of that day, including Hentschel.

Here, the facts of and circumstances of Hentschel's crime support a sentence of three months of incarceration followed by a three-year term of probation, sixty hours of community service, and $500 restitution.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1 (Statement of Facts); ECF No. 32 (Statement of Offense). As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to Hentschel's conduct and behavior on January 6.

### *Hentschel's Role in the January 6, 2021 Attack on the Capitol*

Hentschel, her co-defendant, Pryer, and two others traveled to Washington D.C. from Missouri to participate in the events on January 6.  They attended the "Stop the Steal" rally to

protest the results of the 2020 presidential election. Hentschel took photographs of herself and Pryer at the rally. (Image 1 and 2.) Days after the riot, Hentschel posted these photographs on her Facebook and Instagram social media accounts. Following the rally, Hentschel and Pryer made their way to the Capitol grounds. In a post-plea debriefing, Pryer said that she saw on social media that rioters were engaged in confrontations with police prior to their arrival to the Capitol grounds.



Image 1



Image 2

Hentschel and Pryer made their way to the east side of the Capitol building.   A police barricade was toppled in that area, which allowed rioters to ascend the east steps outside of the Capitol in that location.   Hentschel and Pryer gathered with other rioters on the east steps, which led to the Rotunda Doors.   While on the steps and prior to her entry, Hentschel took a photograph of herself in that location and posted it on her Facebook account on January 6.   (Image 3.)


Image 3

While on the steps, Hentschel also posted a picture of the crowd of rioters on her Facebook account with the caption "Storming the Capitol."   (Image 4.)



Image 4

*The Breach of the Rotunda Doors*

Between 2:25 p.m. and 3:30 p.m. in the afternoon of January 6, the Rotunda Doors were breached three separate times by rioters on the inside and outside of the Capitol building.  The breaches at the Rotunda Doors were some of the most consequential of the Capitol as hundreds of rioters entered the building at that location.  At 2:15 p.m., the doors were secure and undamaged, but the intensity of the crowd of rioters outside of the doors was growing.  At 2:20 p.m., the outside crowd began to bust glass panels from the door.  (Image 5.)  At approximately 2:25 p.m., the first breach of the Rotunda Doors occurred when rioters who are already inside the building opened the doors from the inside.  (Images 6 and 7.) Approximately three minutes later, police officers were able to close the doors again and barricade the doors with benches.  (Image 8.)


Image 5


Image 6


Image 7


Image 8

Police officers were standing in front of the doors to prevent rioters gathered outside from entering.  The rioters who are already inside the building and in that area begin confronting the officers.  The rioters were first yelling and chanting, but the confrontation soon turned physical.  Ten minutes after the doors were first secured, the second breach occurred at 2:38 p.m.  (Image 9.)  During the second breach, the doors were forced open and police officers, who were guarding the doors, were shoved aside, and assaulted.  As a result of this breach, crowds of rioters flooded into the building for the next thirty minutes.



Image 9

An open-source video, available on YouTube, captured the second breach of the Rotunda Doors at approximately 2:37 p.m. from outside of the doors, when Hentschel was present on the east steps of the Capitol and near the doors.[2] From 00:38-01:47 in this video, rioters engage in a heaving maneuver designed to breach the doors while officers were cornered in the entranceway. As they were shoved, sprayed with chemical irritants, and struck with flag poles and other objects, the distressed officers bent over and covered their faces to protect themselves. Rioters stole a riot shield from the officers. Screenshots from the video capture some of the conduct that occurred there, including assaults on the officers cornered in the doorway (circled in white). (Images 10-12.)

---

[2] This video is available at https://www.youtube.com/watch?app=desktop&v=MVullQb-Lec.



Image 10



Image 11



Image 12

At approximately 3:10 p.m., police officers were able to close and secure the doors once

again.  However, a minute later, the rioters breached the doors a third time after they overpowered

the police and rushed in. (Image 13.) At approximately 3:30 p.m. the doors were finally closed and

secured. (Image 14.) By then, hundreds of rioters had breached the Capitol through the Rotunda doors and flooded into the building, causing mayhem in their wake.



Image 13



Image 14

*Hentschel & Pryer's Entry into the Capitol Building*

Hentschel and Pryer were among the first rioters who entered during the second breach. They entered the doors at 2:43 p.m., five minutes after the second breach began, when shattered glass from the door was strewed on the floor, alarms were blaring, and chemical irritant spray was suspended in the air. (Image 15.) When they entered the building, rioters were in physical confrontations with police officers at the entry way.



Image 15 (Hentschel and Pryer are circled in red)

As discussed in more detail below, Hentschel and Pryer both stated during their interviews that no police officers were present and being assaulted when they entered the building. However, video surveillance from inside of the Rotunda Doors (Image 16 and 17) disputes that contention

and show that officers were actively engaged with riots near the entry way.  In Images 16 and 17,

Hentschel and Pryer are circled in red, and the police officers are circled in white.



Image 16



Images 17

After remaining in the entry area, the pair traveled through adjoining hallways, where Hentschel took a photograph of the chaos.  (Image 18.)   Hentschel would later share that photograph to others through her Facebook account.



Image 18

Hentschel and Pryer then walked to and around the Rotunda at approximately 2:50 p.m. (Image 19.)  Hentschel took a photograph of the Rotunda that she later shared on her social media.  (Image 20.)



Image 19



Image 20

The pair then exited the building through the Rotunda Doors at approximately 2:51 p.m.

(Images 21 and 22.)



Image 21



Image 22

After leaving the Capitol, Hentschel posted a photograph of herself with the caption of "I got fucking mased" on her Instagram account.  (Image 23.)



Image 23

*Hentschel's Social Media Posts*

In addition to the social media posts highlighted above, Hentschel bragged and boasted about her involvement in the riot in the hours and days that followed. She attempted to justify her actions and the actions of her fellow rioters. And never once did she offer remorse. After the riot, Hentschel stated on Facebook that the police officers "murdered" Ashli Babbitt, a rioter who climbed through a broken window in order to enter the House Chamber where numerous Members of Congress were sheltering against the frenzied mob. (Image 24.)



Image 24

Later in the evening on January 6, Hentschel had a conversation with another Facebook user ("Person 1"). In the conversation she boasted about her involvement in the riot and that she was among the first group to breach the Capitol. She also made an apparently false claim that she broke into House Speaker Nancy Pelosi's office and stole beer.

PERSON 1:        Hey were you there in that protest!! At the capitol

HENTSCHEL:       Uh yeah dawg

HENTSCHEL:       I'm here

PERSON 1:        Ahhh that's awesome!!!! I was looking for ya on tv! I didn't see ya. But y'all are out there getting it! Did you get inside the capitol?

| PERSON 1: | Well be safe cara and always have fun I support ya 💯 good job!!! Wished I could be there |
|---|---|
| HENTSCHEL: | I was the first group in. Yes. |
| HENTSCHEL: | We storm peloskis office and took her beer. She drinks Corona[3] |
| PERSON 1: | That's wild I'm glad you didn't get arrested wow that's wild lol hell yea |

The next day, January 7, 2021, Hentschel made the following post to her Facebook account. In the post she attempted to justify her actions and those of her fellow rioters. She implied that the violence and destruction that the riot caused was justified and warned of more of the same in the future:

> Was this a peaceful protest? No. Not at all. Was it unjustified? Nope. Sure wasn't. We are sick. Sick of the corruption and SICK of the lies. You have millions of pissed off Americans who have THEIR freedom and THEIR rights on the line, who are not willing to just lay down and submit to this IDEA. WE THE PEOPLE are willing to fight. Will it be peaceful? No, absolutely not.

Also on January 7, Hentschel replied to a comment on one of her Facebook posts from January 6. In the comment, she falsely blamed an outside source for causing the riot, but then reiterated that the riot was justified.

> Did ANTIFA antagonize this? Yes. Did we follow them in? Yes. Was it unjustified? No. We are angry! We are HAVE to put up a fight (sic). We have a point to prove. We will not go down without a fight.

Also on January 7, Hentschel also had a conversation on Facebook where she wrote "…We are safe tonight; but from here on out we face war." (Image 25.)

---

[3] Throughout the investigation, the FBI has reviewed surveillance video footage from near Speaker of the House Nancy Pelosi's office and did not observe HENTSCHEL or PRYER entering Speaker Pelosi's office.



Image 25

On January 8, 2021, Hentschel posted the following picture of her and Pryer at the rally that preceded the riot on her Facebook account.  (Image 26.)



Image 26

In response to that photograph (Image 26), a Facebook user (Person 2) commented on the post.  Person 2 wrote:

Thank you for standing up!!!! Thank you for making history with me. [Three heart emojis] be proud patriots. Do not listen to those who don't know what they are

talking about. And always remember… others opinions of you, are none of your business…

So I should never hear… "they said this about me"

Other people's opinions are of no value to any of us! Great job marching and standing.

HENTSCHEL replied, "… I love you so much [Person 2]. An experience of a lifetime. We are very lucky we got to go." (Image 27.)



Image 27

Hentschel's social media posts make clear that in the days that followed January 6, Hentschel publicly celebrated and defended her actions and the actions of others who were part of the riot at the U.S. Capitol.

*Hentschel's Interview with the FBI*

As was her right, Hentschel declined to speak with law enforcement officials before she pleaded guilty. As required by her plea agreement (ECF No. 31, ¶ 6), Hentschel was interviewed

by an FBI agent.  During the interview, she explained that she traveled to Washington D.C. with a group of individuals, including Pryer, to attend the rally and "have fun" on January 6.  In the morning of January 6, she attended the rally and then went with Pryer to the Capitol.

According to Hentschel, she knew that protestors were surrounding the Capitol building but did not know their goal was to go inside.  Hentschel stated that she did not want to go inside the building because she knew they were prohibited from doing so.  She claims that she had no choice but to enter the building; she either had to enter the Capitol or fight the crowd to avoid entering.  She then claimed that she only stayed inside until she was able to find a safe way out.

Her own contemporaneous statements on social media and the video evidence flatly contradict those claims. First, her social media posts during the riot, including the post of the crowd with the caption "Storming the Capitol" (Image 4) and her posts following the riot demonstrate her intent and disprove any notion that she was an innocent bystander who got pushed into the Capitol because of the crowd.  Second, video footage from the Capitol demonstrate that she had opportunity to leave soon after entering the building, but instead, she walked through halls and the Rotunda and took photographs.

In her interview, Hentschel also stated that she did not see protestors assaulting police, which is again contradicted by video footage documenting her entry. See Image 15 and 16. Hentschel also said that she was hit with tear gas when she exited but does not know the source.

Hentschel acknowledged during the interview that she did not go inside to the House Speaker Pelosi's office and took beer as she boasted about in a Facebook conversation.  Hentschel also acknowledged that she took photographs and videos of the riot with her phone but deleted them prior to her arrest.

*The Charges and Plea Agreement*

On September 22, 2021, the United States charged Hentschel by criminal complaint with violating 18 U.S.C. § 1752(a)(1), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct on Capitol Grounds; 40 U.S.C. § 5104(e)(2)(G), Parade, Demonstrate, or Picket in any of the Capitol Buildings. On October 4, 2021, she self-surrendered. On November 11, 2021, the United States charged Hentschel by a four-count Information with violating the same offenses contained in the criminal complaint.  On May 18, 2022, pursuant to a plea agreement, Hentschel pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Parade, Demonstrate, or Picket in any of the Capitol Buildings. By plea agreement, Defendant agreed to pay $500 in restitution to the Department of the Treasury.

### III.  Statutory Penalties

Hentschel now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Hentschel faces up to six months of imprisonment and a fine of up to $5,000. Hentschel must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).

Hentschel's conduct in the underlying offense as well as her extensive criminal history, chronic recidivism, and disrespect for the laws weigh in favor of a sentence that includes three months of incarceration followed by three-year term of probation, sixty hours of community service, and $500 restitution.

## A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Hentschel's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4)

defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Hentschel personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on her part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningful distinguish her from most other misdemeanor defendants.  Unlike some others, Hentschel did not appear to go to Washington D.C. to cause or engage in violence.  However, she was unhappy with the results of the 2020 Presidential election and decided to go the Capitol and ultimately participated in the riot.

Hentschel joined the mob of rioters, entered restricted grounds, and ascended the east staircase that led to the Rotunda Doors.  Hentschel was among an increasingly agitated and raucous crowd that repeatedly clashed with police and caused multiple breaches at the Rotunda Doors. Hentschel was angry as well, but extremely proud to be there, which is demonstrated by her social media activity at the time of the riot and afterwards.  She voluntarily entered the building, then falsely told FBI agents that she did not have a choice in the matter.  Hentschel and Pryer entered the Capitol building minutes after the second breach of the Rotunda Doors.  There were clear signs of violent entry when they entered the building.  The door's glass panes were shattered, and broken glass was on the floor. Alarms sounded and police had been assaulted in that location minutes prior

to their entry into the building. When they entered officers were still engaged in confrontations with rioters. After roaming throughout adjoining hallways and the Rotunda, they exited the building.

As previously referenced, Hentshel boasted and bragged about her involvement in the riot and being one of the first to make entry into the building.  In some of the posts and messages, she falsely bragged about breaking into Speaker Pelosi's office.  Hentschel's social media statements illuminates her intent on January 6, unequivocally endorsed the riot, and perhaps worst of all, demonstrated that she encouraged future violence.  Her posts also demonstrate a lack of remorse. Hentschel's own words of future violence impel the government to seek a jail sentence in this case.

Finally, Hentshel certainly destroyed evidence after the riot as she admitted to deleting videos and photographs from her phone. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Hentschel

As set forth in presentence investigation report (PSR), Hentschel's criminal history is extensive and demonstrates near constant recidivism for over a decade.  Since 2008, Hentschel has been convicted of three felony offenses and eleven misdemeanors.  ECF No. 36 ¶¶ 23-33.  In 2017, Hentschel was convicted in Greene County, Missouri circuit court of two felony counts of possession of a controlled substance (heroin) and one felony count of possession with intent to distribute a controlled substance (methamphetamine).  *Id*. at ¶ 31.)  The court initially sentenced Hentschel to eight years' incarceration for the possession with intent to distribute offense and seven years for the drug possession offenses. The court then suspended those prison terms and placed Hentschel on probation for five years.  *Id*.

Between 2017 and 2019, Hentschel violated the terms of her probation a remarkable eleven times, and her probation was ultimately revoked, and her underlying prison sentences were reimposed. *Id*. Hentschel was able to participate in an early release program, which made her eligible, absent bad behavior, for release after 120 days incarceration.  *Id*.  She was released from incarceration and placed back on probation for a period of five years. Hentschel was serving her probationary sentence when she traveled to the Capitol and participated in the riot.

In addition to her felony convictions, Hentschel's eleven misdemeanors include driving while intoxicated, harassing a public officer, possession of drug paraphernalia, and driving with a revoked license. *Id*. at 6 ¶¶ 23-30, 32-33. Six of the misdemeanor convictions involved crimes of moral turpitude, which included stealing and theft of items valued between $500 and $25,000.  *Id*. at ¶¶ 24-26, 28-30.

Hentschel's extensive criminal history, particularly her ceaseless violation of the terms of her probation, culminating in her commission of the instant offense while on probation demonstrates that she has little respect for the law.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37); see also *United States v. Mariposa Castro,* 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 43 ("[I]n order for people to understand that if you're going to engage in the type of behavior that you engaged in, if you're going to make the statements that you made on that day in reference to what was occurring, and if you're going to then disseminate that information to others, there has to be a penalty for it.") (statement of Judge Walton)

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for specific deterrence for Hentschel also justifies incarceration followed by probation.  As described throughout this memorandum, Hentschel's actions and words in the underlying offense, her extensive criminal history, and a lack of clear remorse indicates that she has a sense of impunity and is indifferent to lawful authority.  Hentschel has not be dissuaded from engaging in illegal conduct following penalties and her denial of wrongdoing calls for a custodial sentence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Hentschel based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot. Although those like Hentschel convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[6] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Hentschel has pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement officials. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as

30

conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The government has recommended jail time for defendants who made entry in the Capitol through the Rotunda Doors during the breaches and then bragged and boasted about their involvement in the riot through social media. *United States v. Jennifer Leigh Ryan*, 21-cr-00050 (CRC) is a suitable comparison to the relevant sentencing considerations that are present in this case. Ryan plead guilty to a single count of violating 40 U.S.C. § 5104(e)(2)(G). Ryan entered the Capitol through the Rotunda Doors while broken glass was on the floor and alarms were blaring. Ryan exited the building two minutes later but attempted to reenter the building soon thereafter. Throughout the day, Ryan posted videos and photographs through her social media accounts where she celebrated the events of the day. She also livestreamed much of the activity that she witnessed. Ryan's videos and posts contained inflammatory and aggravating language that threatened violence and destruction of property. Following the riot, Ryan continued to make comments on social media platforms that minimized the riot. Ryan's criminal history did consist of two misdemeanor offenses but did not contain any felony convictions or a high number of misdemeanor convictions. The Government recommended a sentence of 60 days incarceration and restitution, which is what Judge Cooper imposed.

The government also requested incarceration in *United States v. Frank Scavo*, 21-CR-254 (RCL), in part, because of Scavo's incendiary social media posts. Like Hentschel, Scavo entered the Capitol through the Rotunda Doors and remained in the Capitol building for ten to fifteen minutes. Scavo posted comments and videos to Facebook while inside the Capitol that captured

him chanting "Treason!" and other incendiary statements.  On Scavo's Facebook account, he posted comments that made light of and minimized the riot.  But unlike Hentschel, Scavo had no criminal history, submitted to two pre-arrest voluntary interviews with the FBI, and voluntarily produced evidence to the FBI that captured his entry and conduct at the Capitol.  Even so, Judge Lamberth went above the Government's recommendation and sentenced to Scavo to two months incarceration, a $5,000 fine, and $500 restitution.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.      The Court's Lawful Authority to Impose a Split Sentence

The sentence requested by the government—three months of incarceration followed by 36 months of probation—is a lawful one.  As this Court recognized when imposing such a sentence in *United Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022), a sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant

convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3). At least eight other judges of this Court agree. *See United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Blakely*, 21-cr-00356 (EGS), ECF 38 (D.D.C. July 14, 2022); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022); *United States v. Caplinger*, 21-cr-00342 (PLF), ECF 74 (D.D.C. August 1, 2022).[7]

Alternatively, if this Court were to impose a term of incarceration of 14 days or fewer, it could make that prison term a condition of probation pursuant to 18 U.S.C. § 3563(b)(10). Although the statute does not define an "interval of time," case law suggests that it should amount

---

[7] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

to a "brief period" of no more than a "week or two" at a time.  *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of  confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21-cr-620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21-cr-370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43  (same); *United States v. Cameron*, 22-cr-00017 (TFH) ECF 36 (D.D.C. Aug. 17, 2022) (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk

of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.  For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Hentschel to three months of incarceration followed by three-year term of probation, sixty hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:

/s/ *Matthew Moeder*
Matthew Moeder
Assistant United States Attorney
MO Bar No. 64036
400 East 9th Street, Room 5510
Kansas City, Missouri 64106
(816) 426-4103
Matthew.Moeder@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2022 I caused a copy of the foregoing opposition to be served on defense counsel of record via email.

*/s/ Matthew Moeder*

Matthew Moeder
Assistant United States Attorney